# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DR. GEORGINE DeMARINO )
and KAREN BRAY, )
                              )    Civil Action No.
            Plaintiffs, )
                              )
           vs. )
                              )
JONATHAN K. HERGERT and )
ECKERT SEAMANS CHERIN & MELLOTT, )
LLC, )
                              )
           Defendants. )

## COMPLAINT

Plaintiffs Dr. Georgine DeMarino and Karen Bray, through their counsel, state as follows:

1.      This action arises under the securities laws of the United States and Pennsylvania and Pennsylvania common law as the result of misrepresentations and failures to disclose material facts that induced Plaintiffs to invest in now worthless securities in Main Medical Holding, LLC ("Main Holding") and its subsidiaries, Mid-Atlantic Imaging, LLC ("MAIN") and Main Medical Ventures ("MMV").   In addition, Plaintiffs seek recovery of damages arising from Defendant Jonathan K. Hergert's ("Hergert") negligence and breaches of fiduciary duties as a Manager of Main Holding and Director of MAIN and MMV, which he undertook while also a Partner at Eckert Seamans Cherin & Mellott, LLC ("Eckert Seamans"), and Plaintiff DeMarino seeks damages arising from Defendant Hergert's breaches of professional duties while acting as counsel to her.  Defendant Eckert Seamans is vicariously liable for Defendant Hergert's actions during, and within, the scope of his work for that law firm.

## JURISDICTION AND VENUE

2. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 and its supplemental jurisdiction under 28 U.S.C. § 1367. Certain of the claims herein arise under the securities laws of the United States and all of the claims raise common issues of fact such that they constitute part of the same case and controversy. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the Defendants reside or have a principal place of business in this judicial district.

## INTRODUCTION

3. Main Holding was conceived in April 2004 by Anthony J. Geramita ("Geramita"), with the advice and substantial assistance of Defendant Hergert, to acquire a medical diagnostic imaging business in the Pittsburgh area that operated seven (7) fixed imaging sites and provided mobile diagnostic imaging under the name "Main Medical."

4. Main Medical, Inc. founded the Main Medical imaging business in 1985. According to Main Medical's website, by 2000 it had "evolved from a manager of Cardiac Care Centers to a multimillion dollar integrated health care company specializing in diagnostic imaging." In that year, moreover, it was named for the second straight year as one of the 500 fastest growing companies in the United States by *Inc.* magazine.

5. In 2000, Main Medical, Inc. created a joint venture between its wholly owned subsidiary, MAIN (which operated stand-alone diagnostic imaging centers), and UPMC Diversified Services (UPMC DSI). The joint venture, which was called Main Medical Ventures ("MMV"), was 51% owned by MAIN (and, therefore, Main Medical, Inc.) and 49% owned by UPMC DSI. Collectively, Main Holding, MAIN, and MMV are referred to herein as "the Main Medical companies."

6. By 2004, the Main Medical diagnostic imaging business included seven (7) stand-alone imaging sites (some additional sites that it planned to close) and mobile diagnostic imaging services in a 100-mile radius around Pittsburgh. The facilities were all managed through Main Medical's office on the south side of Pittsburgh. Although Main

Medical's diagnostic imaging business had not, in general, been highly profitable, by 2004 it was a stable, well-established business that could be touted as the "leading provider of diagnostic imaging services in southwestern Pennsylvania," with "prospects for continued growth [that] appear[ed] positive from both an industry and company specific standpoint**."** *Main Medical Holding LLC, Confidential Information Circular*, July 7, 2004, at pp. 10, 11 (hereinafter, "July 7 Circular").

       7.     During or prior to April 2004, Geramita, who was the Chief Financial Officer of Main Medical, Inc., proposed to purchase the diagnostic imaging business of Main Medical, Inc. with the help of investors and key advisors. Among Geramita's first acts in furtherance of this plan was to obtain the assistance of Defendant Hergert, with whom Geramita had worked for several years in a variety of businesses. Defendant Hergert agreed both to provide legal services to Geramita for the new venture and to become one of its "Managers."

       8.     Shortly thereafter, Geramita recruited Plaintiff DeMarino—a radiologist who worked with Main Medical, Inc. as an independent contractor—to serve as Medical Director and invest as one of the founding members of the new venture. Plaintiff DeMarino was induced to invest in the new venture based on the apparent strength and stability of the Main Medical diagnostic imaging business and Geramita's representations (i) that she and Geramita would have equal ownership interest in the new company, (ii) that Geramita would be in charge of the business affairs of the new company, and (iii) that Plaintiff DeMarino would be in charge of the medical affairs of the new company. In addition, Geramita asked Plaintiff DeMarino to be one of the managers of the new company, explaining that it would help his efforts in soliciting financing for the venture to have a radiologist on the board.

       9.     Geramita and Defendant Hergert arranged for the new venture to purchase the Main Medical diagnostic imaging business on or about August 16, 2004.

      10.    As discussed below, the Main Medical imaging business was doomed from the day it was acquired by Main Holding—the company created by Geramita and Defendant Hergert to buy the business— because Geramita and Defendant Hergert negligently,

deceptively, and/or improperly orchestrated the purchase of the business without sufficient equity funding, and by assuming debt that Main Holding (and its new subsidiaries) had no reasonable prospects for repaying.

11.     The instant action arises from near complete loss of Plaintiffs' investments in the venture, and the additional losses suffered by Plaintiff DeMarino, as the result of Defendant Hergert's actions, omissions, negligence, and breaches of fiduciary and professional duties.  Also, as discussed below, Plaintiffs' investments would not have been made (and lost) in the absence of Defendants' improper acts, including (i) false, deceptive, incomplete and/or misleading information about Main Holding and the acquisitions to be made by Main Holding that Defendant Hergert provided to Plaintiffs in the course of efforts to solicit their investments, (ii) Defendant Hergert's negligent and/or willful participation in, approval of, and failure to prevent (through required disclosures of material facts), a deceptive and/or fraudulent scheme to acquire Plaintiffs' funds, and/or (iii) Defendant Hergert's failure to meet his professional and fiduciary duties to Plaintiff DeMarino and the Main Medical companies.

## PARTIES

12.     Plaintiff Georgine DeMarino is a board certified radiologist, who is licensed to practice medicine in the Commonwealth of Pennsylvania.  Plaintiff DeMarino resides at 1320 Meridian Drive, Presto, Pennsylvania.

13.     Plaintiff Karen Bray is an adult individual who resides at 500 Robin Drive, Pittsburgh PA  15220.

14.     Defendant Eckert Seamans Cherin & Mellot, LLC is a law firm with a business address of U.S. Steel Tower, 600 Grant Street, 44th Floor, Pittsburgh, Pennsylvania 15219.

15.     Defendant Jonathan K. Hergert is an attorney employed by Eckert Seamans in its Pittsburgh office.

## FACTS

### A. The Relevant Entities

16. Main Holding was a Delaware Limited Liability Company created by Defendant Hergert in May 2004 to acquire the diagnostic imaging business of Main Medical, Inc. Defendant Hergert was both a Manager of Main Holding and its legal counsel from the time of its formation until its *de facto* dissolution in August/September 2005.

17. On August 16, 2004, Main Holding acquired MAIN and its subsidiary MMV.

18. MAIN is a Pennsylvania Corporation. Defendant Hergert was both a Director of MAIN and its legal counsel from August 16, 2004, until its *de facto* dissolution in August/September 2005.

19. MMV is a Pennsylvania Limited Liability Company. Defendant Hergert was both a Director of MAIN and its legal counsel from August 16, 2004, until its *de facto* dissolution in August/September 2005.

### B. Defendant Hergert's Duties to Plaintiffs

20. This action arises from breaches of Defendant Hergert's duties to Plaintiffs as: (i) a promoter and seller of securities of the Main Holding companies; (ii) a Manager of Main Holding and Director of MAIN and MMV; (iii) counsel to the Main Medical companies, who actively participated in both their offering of securities and tumultuous closing; and (iv) counsel to Plaintiff DeMarino, individually.

21. Defendant Hergert was a key player in the securities offerings of the Main Medical companies and in directly providing materials to their potential investors. Defendant Hergert, therefore, had duties under both Pennsylvania and United States law to provide truthful information about the companies and their plans and neither directly nor indirectly: "(a) To employ any device, scheme or artifice to defraud; (b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; (c) To engage in any act, practice

or course of business which operates or would operate as a fraud or deceit on any person." 70 Pa. Code § 1-401. *See also* Rules 10(b)-5 and 10(b)-9 promulgated by the U.S. Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, (15 U.S.C. § 78a et seq.).

22.     In view of his experience in private and public offerings of securities, and his duties as attorney for the Main Medical companies in connection with their offers and sales of securities, Defendant Hergert is subject to a higher standard of care than other Managers or Directors.  As a Manager/Director of each of the Main Medical companies, Defendant Hergert owed fiduciary duties to Plaintiffs as the Members and owners of those companies and, when those companies became insolvent, to Plaintiff DeMarino as a creditor.  Defendant Hergert's fiduciary duties to Plaintiffs included the duties of care, loyalty, candor and disclosure, and good faith.

23.     In asserting a claim for contribution in a related action, Defendant Hergert has alleged that Plaintiff DeMarino also had fiduciary duties related to the business and operations of the Main Medical companies.  Plaintiff DeMarino was a Member and Manager of Main Holding with management duties related to medical services only.  Plaintiff DeMarino was not experienced in business or financial matters when she became a Manager of Main Holding, and she had little, if any, input into the company's business affairs.  To the limited extent Plaintiff DeMarino participated in any business or financial transactions of Main Holding, she relied in good faith on the advice of Defendant Hergert and Geramita, who she believed were experienced and experts in such matters.

24.     Defendant Hergert (and, therefore, Eckert Seamans) also had professional duties to Plaintiff DeMarino as her attorney.  In this regard, Defendant Hergert provided Plaintiff DeMarino legal advice in connection with her investment in Main Holding, loan to the Main Medical companies and his requests for her to execute various documents.  Further, Defendant Hergert never advised her of any intention to represent the Main Medical companies exclusively and not her and/or Geramita, and he never suggested that she seek independent legal counsel to

review the legal work product that he, and Eckert Seamans, prepared for her and advised her to execute. In addition, Defendant Hergert accepted her personal check in the amount of $12,500 for his law firm's retainer. Accordingly, Plaintiff DeMarino reasonably believed that he and Eckert Seamans were obligated, as counsel to both the Main Medical companies and herself individually, to protect her legal interests in her dealings with Main Medical, Inc. and the Main Medical companies.

25.     Defendant Hergert and Geramita, moreover, fostered Plaintiff DeMarino's trust by reassuring her of the good progress toward completion of the acquisitions, while negligently and/or willfully failing to advise her of Main Holding's mounting financing problems both before and after its acquisition of MAIN and MMV. Further, contrary to his duties to both Main Holding, and Plaintiff DeMarino individually, he failed to review with her the meaning of, and risks related to, the legal documents he prepared for her and the Main Medical companies, or of her rights and obligations as a Member and Manager of Main Holding.

26.     Indeed, to the limited extent he discussed documents he had prepared for her execution, he negligently or willfully misled her as to the risks arising from their execution. For example, on or about August 16, 2004, Defendant Hergert arranged to meet with Plaintiff DeMarino at her home to obtain her signature on additional documentation for the acquisitions. Once at her home, Defendant Hergert for the first time informed Plaintiff DeMarino that she would need to sign a personal guarantee for $375,000 in connection with the acquisitions. Having no prior knowledge of this requirement, Plaintiff DeMarino was reluctant to execute the guarantee. Plaintiff DeMarino, however, agreed to execute the Guarantee only after Defendant Hergert negligently and/or fraudulently advised her that such a personal guarantee was "routine" and, in this instance, safe, because "the Company had the money to repay the debt."

**C.     Plaintiffs' Investments in the Main Medical Companies**

       *i.  Plaintiff DeMarino's Membership Investment and May 5, 2004 Note*

27.     In April 2004, Plaintiff DeMarino was informed by Geramita of his plans to take over the diagnostic imaging business of Main Medical, Inc. (with the assistance of

- 7 -

investors) and he sought Plaintiff DeMarino's participation in the venture as both an investor and radiologist (and who also could serve as the venture's Medical Director). Geramita explained that he planned to raise enough money to pay $1 million in cash to Main Medical, Inc. and to cover the expected costs of operating the diagnostic imaging business (including payment of outstanding debts).

        28.    Plaintiff DeMarino was familiar with the diagnostic imaging facilities of Main Medical, Inc. by virtue of her medical practice, because she had been providing professional radiology services as an independent contractor in association with Main Medical, Inc. for the prior 2 years. Plaintiff DeMarino was not knowledgeable about the financial condition of Main Medical, Inc.'s diagnostic imaging business. In view of Main Medical, Inc.'s facilities for diagnostic imaging, patient volumes, relationship with UPMC and reputation, however, the imaging business appeared to be both stable and sound.

        29.    In addition to her knowledge of certain of the Main Medical facilities, Plaintiff DeMarino knew Geramita from his work as CFO of Main Medical, Inc. Plaintiff DeMarino believed that Geramita had good experience in the diagnostic imaging business as the result of his duties at Main Medical, Inc. and his prior experience in the health care business. Further, and in view of her dealings with Main Medical, Inc. and Geramita, Plaintiff DeMarino had no reason to doubt Geramita's honesty and good faith.

        30.    In their initial discussions about the attempt to acquire the diagnostic imaging business of Main Medical, Geramita proposed that he and Plaintiff DeMarino each invest in the new business as equal partners. Further, Geramita would handle the business affairs of the company and raise the more than $1 million in additional funds required for the acquisition. Meanwhile, Plaintiff DeMarino would handle medical affairs of the company. Geramita also explained that the team would also include Defendant Hergert, who would advise them on business matters and handle legal matters for the new venture.

        31.    Plaintiff DeMarino had no experience with corporate transactions and was an unsophisticated investor. Plaintiff DeMarino was interested in Geramita's plan, however,

because she knew Main Medical's imaging business was well established, stable, and operated in some good locations. Plaintiff DeMarino also believed and relied upon Geramita's optimistic assessment of future prospects of the business and trusted that he, and Defendant Hergert, would protect her interests and investment. Finally, an orderly transition of the business from its current owners would allow Plaintiff DeMarino to continue providing radiology services to Main Medical's patients.

32. During this same time in which Geramita was soliciting Plaintiff DeMarino's investment, Geramita and Hergert were negotiating with Main Medical, Inc. on the terms of the proposed acquisitions of its diagnostic imaging business.

33. In early May 2004, Geramita advised Plaintiff DeMarino that they would need $300,000 to get the new venture started. Notwithstanding Geramita's commitment to make half of the initial investment in the venture, Geramita requested Plaintiff DeMarino to lend him the money for his half share of the new company. Geramita declared that "he was good for the money" but his cash was tied up in a project to renovate his house. Plaintiff DeMarino agreed to Geramita's request.

34. At Geramita's request, Defendant Hergert prepared a promissory note, dated May 5, 2004, in the original principal amount of $150,000, to evidence and provide for repayment of Plaintiff DeMarino's loan to Geramita (the "May 5 Note"). The May 5 Note was extremely favorable to Geramita: despite the large amount of indebtedness evidenced by the Note, it does not provide for any collateral or security to protect Plaintiff DeMarino. Ultimately, Geramita defaulted on the May 5 Note.

35. At the time Plaintiff DeMarino agreed to finance Geramita's share of the business, Plaintiff DeMarino did not understand the difference between a secured and unsecured Note. Defendant Hergert, who drafted the May 5 Note for her and Geramita, neither explained the difference to her nor suggested that she seek independent counsel to advise her. Plaintiff DeMarino agreed to accept the unsecured May 5 Note for her $150,000 loan to Geramita,

because she believed that, in drafting the Note, Defendant Hergert was obligated to treat her fairly and protect her interests, which he did not do.

36.     In preparing the May 5 Note, Defendant Hergert knew that the proceeds of the May 5 Note were for the sole purpose of acquiring, in Geramita's name, one half of the equity in a business to be formed for the purpose of acquiring Main Medical, Inc.'s diagnostic imaging business.

37.     On May 7, 2004, Defendant Hergert sent a draft "Letter of Intent" to Main Medical, Inc. which stated that "an entity to be formed (the "Buyer") would purchase MAIN for $1,125,000.  Defendant Hergert's letter further stated that $250,000 of the purchase price would be paid in advance of closing, provided that Buyer had received initial equity financing of $250,000.  Remarkably, the Letter of Intent stated that Advance Payment was to be refunded to "Anthony J. Geramita," rather than to "Buyer" or Plaintiff DeMarino (who provided the funds) if the parties failed to reach a final agreement.

38.     On May 7, 2004, Plaintiff DeMarino provided personal checks for payments to Main Medical, Inc., in the amount of $250,000 and to Defendant Eckert Seaman in the amount of $12,500.   Plaintiffs' $250,000 personal check, rather than any payment by Main Holding, LLC, was used for the Advance Payment set forth in the Letter of Intent.  Likewise, Defendant Eckert Seamans accepted Plaintiff DeMarino's personal check as payment for its retainer fee.

### ii.  *Plaintiff Bray's $50,000 Investment*

39.     Plaintiff Bray became interested in investing in Main Holding, because she was a long-time friend of Plaintiff DeMarino, she had experience in the health care field, and she believed that Main Holding provided a good investment opportunity.

40.     On or about July 9, 2004, Defendant Hergert sent Plaintiff Bray a copy of a Confidential Information Circular (the "July 7 Circular") to solicit her investment in Main Holding.  The July 7 Circular was prepared by Defendant Hergert with input from Geramita and the companies' bookkeeper.

41.     Plaintiff DeMarino was not asked to participate in preparation of the July 7 Circular in any respect, and she did not do so.  Plaintiff DeMarino was first provided a copy of the July 7 Circular by mail on July 9, 2004; it was sent to her in the same manner, and at the same time, as other potential investors in Main Holding.

42.     Among other statements, the July 7 Circular included two important representations by Defendant Hergert and Main Holding.  First, the July 7 Circular advised potential investors that Main Holding would not proceed with its plans to acquire MAIN and MMV, if it failed (i) to raise at least $1.2 million in equity, and (ii) to obtain at least $2 million for use upon completion of the acquisitions as working capital (including the anticipated need to pay off $550,000 of MMV's debt to UPMC DSI within 90 days of closing).  The July 7 Circular referred to these financial requirement as "Minimum Closing Conditions."  Second, Defendant Hergert and Main Holding, in the July 7 Circular, committed to provide updated information to potential investors if there were material changes in circumstances affecting Main Holding and/or the proposed acquisitions.

43.     Plaintiff Bray reviewed the July 7 Circular in detail, and relied on it, in deciding to invest $50,000 in Main Holding.

44.     On August 13, 2004, Plaintiff Bray executed a subscription agreement to purchase 167 Class B units at $300 per unit, for a total investment of $50,100.

45.     At no time prior to Plaintiff Bray's investment did Defendant Hergert or anyone else advise her of material changes in circumstances affecting Main Holding and/or the proposed acquisitions.

46.     The subscription agreement executed by Plaintiff Bray on August 13, 2004 required her to represent that "she has not relied, and is not relying, on any information concerning the Company other than that included in the [July 7] Circular."

47.     At the time Plaintiff Bray executed the subscription agreement, however, the July 7 Circular was materially inaccurate, misleading, manipulative and deceptive.  Contrary to the representation of the July 7 Circular, however, Plaintiff Bray was not provided with

updated information relevant to her investment, such as the failure of the company to raise sufficient equity to meet the Minimum Closing Conditions specified therein. Instead, Defendant Hergert encouraged Plaintiff Bray to rely on the inaccurate, misleading, manipulative, and deceptive July 7 Circular.

48.     On or about August 13, 2004, Defendant Hergert spoke with Plaintiff Bray about her potential investment in Main Holding. During their short telephone conversation, he specifically asked her if she had read the July 7 Circular and if she understood it. She responded affirmatively. During that conversation, Defendant Hergert negligently and improperly failed to advise Plaintiff Bray about materially changed circumstances that substantially increased the riskiness of her potential investment. In particular, Plaintiff Hergert failed to advise Plaintiff Bray that, contrary to the express terms of the July 7 Circular, Main Holding had failed to meet the Minimum Closing Conditions but nonetheless intended to complete its acquisitions of Main and MMV with additional debt financing. Plaintiff Hergert further failed to advise, *inter alia*, Plaintiff Bray that the financial forecasts in the July 7 Circular were wrong because Main Holding did not have the specified levels of equity investments and working capital, but instead had taken on substantial additional debt and would borrow against its accounts receivables to finance its acquisitions.

### iii.  *Plaintiff DeMarino's Personal Guaranty and Secured Note*

49.     After agreeing to invest $300,000 in Main Holding in early May 2004 and paying $262,500, Plaintiff DeMarino returned to her medical practice and awaited further information and instructions from Geramita and Defendant Hergert. Plaintiff DeMarino had no experience in complex business transactions and she trusted that Geramita, Hergert, and their assistants would complete the takeover and advise her of any changes or problems. At Geramita's request, Plaintiff DeMarino agreed to be a Manager of the new company, but her role was strictly limited to management of medical matters. At no time did Geramita or Defendant Hergert discuss efforts to obtain financing with her or seek her input on any business decisions related to the new venture or negotiation of its acquisitions.

50.     In June 2004, Defendant Hergert sent drafts that he had written of the Main Holding Limited Liability Company Agreement ("Main Holding LLC Agreement") to Plaintiff DeMarino.  At some point, Defendant Hergert directly or indirectly sent a final version of the Main Holding LLC Agreement but, on information and belief, he never requested her to execute it, never advised Plaintiff DeMarino that he was not acting on her behalf in preparing it, and never suggested that she seek separate counsel to review it.

51.     On July 28, 2004, Plaintiff DeMarino attended what she believed to be the "closing" for the Main Holdings' purchase of MAIN and MMV.  At the "closing," and pursuant to Defendant Hergert's instructions, she signed numerous documents, including the purchase agreements for the acquisition of MAIN from Mid-Atlantic Imaging and the acquisition of UPMC DSI's interest in MMV.  In addition, Defendant Hergert had Plaintiff DeMarino sign various resolutions of Main Holding.  Defendant Hergert did not explain the documents or their risks.  Again, Plaintiff DeMarino executed the documents in reliance on the expertise of Defendant Hergert and Geramita.

52.     At the time of the "closing," Plaintiff DeMarino was not advised by Defendant Hergert or Geramita, that Main Holding had failed to raise sufficient financing for the transaction, but that Defendant Hergert and Geramita had decided to complete the purchase anyway.  Plaintiff DeMarino was told only that a portion of the funding had been delayed, but that the deal would be completed when it arrived.

53.     On or about August 14, 2004, Main Holding obtained additional financing from David Gilliland, who is a plaintiff in a related case.  Unknown to Plaintiff DeMarino, however, Main Holding had raised a total of only $750,100 in equity:  300,000 from Plaintiff DeMarino, 400,000 from Dave Gilliland, and 50,100 from Karen Bray.  To complete the acquisition, however, Main Holding required a total of $1,125,000 in cash to acquire MAIN, and an additional $500,000 to acquire the 49% of MMV from UPMC DSI.  In other words, even with additional funding from Gilliland, Main Holding was short nearly $875,000.00.  In addition to the $875,000 shortfall, the acquisitions would require Main Holding to pay an additional

$1 million plus interest to UPMC over the next year, with $550,000 of that amount due within 90 days of the closing. Finally, the closing required Main Holding to pay various lending and transactions fees, including the bill for legal services of Defendant Hergert and his law firm. The legal fees alone were in excess of $100,000.

54.     To allow the acquisitions to be completed, Defendant Hergert and Geramita arranged to use cash that remained in MAIN itself and to borrow additional funds that MAIN had no realistic ability to repay. First, Defendant Hergert and Geramita borrowed against the new company's principal source of working capital—its accounts receivable. Contrary to statements of the July 7 Circular, Main Holding was unable to arrange for significant credit based upon hard assets, such as its medical equipment, or to sell any of its Class C (or credit support) units. In mid-August 2004, the total amount that Main Holding could borrow was approximately $497,000. On August 15, 2004, Defendant Hergert, on behalf of the new company, borrowed $490,000 of that amount, leaving the Main Medical companies with available credit of approximately $7,000.

55.     Second, Defendant Hergert and Geramita negotiated a revision to the Purchase Agreement between Main Holding and Main Medical, Inc. Under the Purchase Agreement, as executed by Plaintiff DeMarino, Main Medical, Inc. was to receive $275,000 in cash at closing, and an additional $100,000 was to be placed in escrow to cover any outstanding responsibilities. (These sums were in addition to the $250,000 Main Medical, Inc. had already received and $500,000 to be paid to one of the owners of Main Medical, Inc.) In view of Main Holdings cash deficiency, Main Medical, Inc., however, agreed with Defendant Hergert to reduce the amount it was owed at closing by $275,000 and to eliminate a payment of $100,000 to be paid by the Buyer into an escrow account and instead accept a short term Note, payable by the end of the year, for the full $375,000 (the "MMI Note"). As a condition of this loan, however, Main Medical, Inc. required the principal owners of Main Holding—namely Geramita and Plaintiff DeMarino—personally to guarantee the amount of the note.

56.     Although he negotiated the terms of the $375,000 loan from Main Medical, Inc. and personal guarantee, Defendant Hergert never informed Plaintiff DeMarino of either new requirement of the deal in advance or that any information in the July 7 Circular was outdated and inaccurate.  Instead, on or about August 16, 2004, Defendant Hergert went to Plaintiff DeMarino's home to obtain her signature on the personal guarantee that he needed to complete the acquisition.  At her home, rather than explain to her the risky changes to the transaction, the risks of the personal guarantee, or advise her to seek independent counsel, Defendant Hergert persuaded her to execute the guarantee by describing it as routine paperwork.

57.     Defendant Hergert, moreover, negligently, falsely, recklessly and/or fraudulently told Plaintiff DeMarino that the personal guarantee was a mere formality to get the deal done and not a problem, because "the company already had the money to repay the debt." In fact, having borrowed $865,000.00 of the $1,612,500.00 of the purchase price, in addition to the $1 million it would owe to UPMC DSI, the Main Holding companies were insolvent upon completion of the acquisition of MAIN and MMV and unable to repay their debts.

58.     In view of its insolvency, on or about October 22, 2004, Defendant Hergert sent Plaintiff DeMarino a proposed $300,000 secured promissory note ("October 22 Note") to evidence and provide for repayment of a supposed "bridge loan" to the Main Medical companies.  Plaintiff DeMarino had been requested to make a loan to the Main Medical companies for 2 to 3 weeks to enable them to pay off the MMI Note in advance of the companies' receipt of expected funds.  In transmitting the proposed October 22 Note to Plaintiff DeMarino, Defendant Hergert stated only "here is the paperwork for the bridge loan."  He did not advise her of the risks of the loan, or suggest that she seek independent counsel.

59.     Plaintiff DeMarino thereafter called Defendant Hergert to discuss the bridge loan.  Among other questions, Plaintiff DeMarino told Defendant Hergert she did not understand why the money was needed, because he had told her in August that the Main Medical companies already had the money to pay off the $375,000 MMI Note.  Plaintiff DeMarino also asked Defendant Hergert if there were problems at the Main Medical companies she needed to

- 15 -

be aware of, and if it would be safe to make the loan. She was especially concerned about this short-term loan to the Main Medical companies because she would need to borrow against her life insurance policy to provide it.

60. Defendant Hergert negligently, falsely, and improperly told her that the loan was not a big deal and would be fine. Defendant Hergert did not advise Plaintiff DeMarino to seek independent counsel or that the Main Medical companies were in financial peril. Despite her reservations and based on Defendant Hergert's assurances, Plaintiff DeMarino agreed to the loan, which she was able to make only by borrowing against her life insurance policy.

### D. Material Omissions from Information Provided to Plaintiffs

61. The July 7 Circular that Defendant Hergert drafted and sent to Plaintiffs failed to disclose material information that would have dissuaded Plaintiffs and other reasonable investors from investing in Main Holding.

62. First, neither Defendant Hergert nor the July 7 Circular disclosed that Geramita, Defendant Hergert, and Defendant Hergert's law firm had recently developed and invested together in (with others) a private corporation, called the Cosmetic Dermatology Network ("CDN"), which "failed" shortly before Geramita and Defendant Hergert initiated Main Holding. According to Defendant Hergert, the failure of CDN resulted in the complete loss of his, and presumably all, investments in the company.

63. On or about January 15, 2003, Defendant Hergert completed and distributed a Confidential Memorandum that appears to have been used to solicit physicians to participate in CDN's physician "Network." The memorandum touted both Geramita and Defendant Hergert as members of the "Management Team & Consultants." Geramita was identified as the Executive Vice President, Chief Operating Officer, Chief Financial Officer of the company and Director. Defendant Hergert was identified as "Jonathan K. Hergert, Attorney, Eckert Seamans Cherin & Mellott, LLC, Legal Consultant; Director." That memorandum emphasized Geramita's "seventeen years experience as CFO of a health company called Quest Diagnostics," that he had founded his own private accounting firm, and that he had previously

"applied and demonstrated his accounting and finance savvy in various positions with a variety of companies." With respect to Defendant Hergert, the Memorandum cited his equity membership in Eckert Seamans Cherin & Mellott LLC, and his "extensive experience in mergers acquisitions, corporate financing transactions, public and private offerings of equity and debt securities [sic] and healthlaw compliance."

64. Given the undeniable importance of management competence to the proposed takeover of Main Medical's imaging business, the participation of Geramita and Defendant Hergert in the formation and failure of CDN would have been material to Plaintiffs and other reasonable investors, had they been advised of it. When CDN failed, moreover, it ceased to operate without filing for bankruptcy. Accordingly, it would have been difficult, if not impossible, for Plaintiffs to learn of this failure in the absence of disclosure by Defendant Hergert and Geramita.

65. Second, neither Defendant Hergert nor the July 7 Circular disclosed to Plaintiffs that the company to be purchased with their investments, MAIN, was operating with insufficient working capital and generating too little revenue to cover its debts. The structure of the $250,000 Advance Payment to Main Medical, Inc., discussed above, only makes sense if those funds were needed to sustain MAIN's solvency prior to closing, and/or misleadingly to improve the appearance of its balance sheet to potential investors.

66. Third, neither Defendant Hergert nor the July 7 Circular disclosed to Plaintiffs that Main Holding was obligated to purchase UPMC DSI's interest in the diagnostic imaging business, because of a "put option" held by UPMC DSI. In view of UMPC DSI's power to force the acquisition of MMV, the terms of that acquisition were likely to be unfavorable to Main Holding and at an inflated price.

67. Fourth, neither Defendant Hergert nor the July 7 Circular disclosed to either Plaintiff that the Board of Directors of Main Medical, Inc. decided, in mid-May 2004, to award Geramita a "bonus," or kickback, of 150,000 shares of Main Medical, Inc.'s stock (valued at $2 per share), contingent on Main Holding's timely completion of its purchase of MAIN from

- 17 -

Main Medical, Inc.  Defendant Hergert both discussed this putative bonus with counsel for Main Medical, Inc. and received a letter confirming the bonus on May 24, 2004—well prior to completion of the July 7 Circular.

68.     Any prospective investor in Main Holding would consider it material that as soon as Main Holding finished paying Main Medical, Inc. and its affiliates a total of $1,125,000 in cash—none of which was provided by Geramita— to purchase MAIN, Main Medical, Inc. would reward Geramita with assets valued at $300,000.  At a minimum, this "bonus" suggests the price for MAIN to be paid by investors other than Geramita was $300,000 too high.

69.     Fifth, neither Defendant Hergert nor the July 7 Circular disclosed to Plaintiffs that Defendant Hergert negotiated a credit agreement with Capital Source LLC, pursuant to which all of Main Holding's receivables would be collateralized to obtain $490,000 to enable Main Holding to complete its acquisitions.  Such a use of receivables not only increased the cost of gaining access to the companies' most significant source of revenue, but also eliminated the safety net provided by such receivables for quickly obtaining working capital if needed, for example, for an unanticipated expense.

70.     Sixth, and notwithstanding Main Holding's express commitment to update the information set forth in the July 7 Circular in the event the information "should … change materially," Defendant Hergert failed to disclose the following, *inter alia,* prior to closing of the Main Holding offering of shares, the completion of the acquisitions, or the October 22 Note:

(i)     Main Holding had utterly failed to raise the $1.2 million in new equity as "forecast" for July 31, 2004 in the July 7 Circular, even though the offering was extended until August 16, 2004;

(ii)    Main Holding had failed to obtain collateral by selling any Class C shares (or "Credit Enhancement Instruments") to support its plans for a new $2 million credit line;

(iii)   Main Holding failed to meet the Minimum Closing Conditions set forth in the July 7 Circular, which set the minimum baseline for prudent action by the company;

(iv)    Main Holding had sought $1 million in credit based on the collateral value of its equipment, but had been rejected by Capital Source, LLC (its principal source of credit);

(v)     Main Holding collateralized all of its accounts receivable, equipment and other assets to obtain a loan of $490,000 from Capital Source, LLC to help pay for the acquisitions;

(vi)    The Main Medical companies had no ability to repay the $375,000 in debt, to be repaid on an accelerated basis, that Defendant Hergert negotiated for them to borrow from Main Medical, Inc. once the failure to raise sufficient equity for Main Holding's acquisitions became clear;

(vii)   The Main Medical companies would have a total credit availability of less than $8000 upon completion of the acquisitions and obviously far less than the $2 million in working capital it represented was necessary in the July 7 Circular;

(vii)   Main Holding and its newly acquired subsidiaries, MAIN and MMV would be insolvent immediately upon completion of the acquisitions; and

(viii)  Defendants Hergert and Eckert Seamans were not disinterested counsel to the Main Medical companies, but instead had an interest in completing the acquisitions, contrary to Plaintiffs' interests, because they would not otherwise be paid for their services.

**E.    Motive and Scienter**

71.    Geramita had ample financial motive to mislead Plaintiffs because if Main Holding did not complete the acquisitions, Geramita would have been deprived of his professed desire to run a sizable business and, in all likelihood, would have become unemployed.

72.    Defendant Hergert likewise had a significant financial motive to participate in and/or turn a blind eye to misrepresentations or material omissions in communications with investors. During May, June and July, Defendant Hergert provided or supervised hundreds of hours of legal services to Main Holding, LLC. As of August 1, 2004, on information and belief, the outstanding amounts due from Main Holding, LLC exceeded $100,000. At that time, Defendant Hergert knew that Main Holding, LLC had virtually no assets and, therefore, had no ability to pay the substantial legal fees owed to Defendant Hergert and his firm, unless Main Holding completed its acquisitions. (Once the acquisitions were complete,

Defendant Hergert could expect payment either as part of payments during closing, or from the combined working capital and/or credit facilities of the Main Holding and its new subsidiaries).

73.     Although the substantial unpaid legal fees were owed to Defendant Hergert's law firm rather than himself personally, non-payment of such a large amount had significant potential to hurt his standing in his firm and/or his compensation.  Indeed, having recently led his firm into its failed investment in CDN, Defendant had ample cause for concern.

**F.     Breaches of Fiduciary and Professional Duties to Plaintiffs**

74.     Defendant Hergert breached fiduciary duties of good faith, loyalty, candor, and/or professional duties to Plaintiffs Plaintiff DeMarino and Bray as prospective investors and Members of Main Holding, and Plaintiff DeMarino as his client.

75.     Defendant Hergert breach his fiduciary and professional duties to Plaintiffs, *inter alia*, by failing to communicate accurate and complete information to them about Main Holding's failure to raise sufficient capital to meet the Minimum Closing Conditions for its acquisitions of MAIN and MMV and other material facts about the proposed transactions between the Main Medical companies and Plaintiffs.

76.     In addition, Defendant Hergert breached his fiduciary and professional duties to Plaintiffs in at least the following ways:

> (i)     Defendant Hergert improperly failed to advise Plaintiffs of, and obtain waivers for, his conflicts of interest in (i) providing legal services to Main Holding, Geramita, and Plaintiff DeMarino in connection with the Main Holding companies, while also serving as a Manager of Main Holding, and (ii) providing legal services to Main Holding and Plaintiff DeMarino, while having duties to provide legal advice to Geramita in other matters.   In this regard, moreover, Defendant Hergert failed to comply with the terms of the Main Holding LLC Agreement he drafted, which required him to seek ratification or authorization from the disinterested Managers of Main Holding to provide legal services to Main Holding while also serving as a Manager;

> (ii)    Defendant Hergert failed to advise Plaintiff DeMarino of the differences between a secured and unsecured Note, to advise her to seek independent counsel, or otherwise to deal with her in good

faith with respect to the unsecured May 5 Note for $150,000, which he prepared for Geramita as a means of financing Main Holding;

(iii)    On information and belief, Defendant Hergert failed to provide the final version of the Main Holding LLC Agreement to Plaintiff DeMarino for execution, to obtain her written agreement to its terms, to explain her duties and obligations as a Member and Manager under the terms of the Agreement, or in the alternative, to explain his role in preparation of the Agreement and suggest that she seek independent counsel;

(iv)    Defendant Hergert negligently arranged to finance and close Main Holding's acquisitions using: (i) virtually the full credit available from collateralization of the Main Medical companies' accounts receivable and assets, and (ii) $925,000 of debt to UPMC DSI and Main Medical, Inc. to be repaid within 90 days of closing, even though the Main Medical companies would plainly lack sufficient capital or income to repay such debts and operate its business;

(v)    Defendant Hergert closed Main Holding's acquisitions of Main and MMV, when he knew or should have known with the exercise of reasonable diligence that such transactions were not in the best interests of Main Holding or its minority shareholders, but were instead in the interest of Geramita and Defendants;

(vi)    Defendant Hergert directly aided and abetted a breach of the Main Holding LLC Agreement, which he had drafted, by assisting and permitting Geramita to purchase 1333 Class B units of Main Holding that were encumbered, subject to an option agreement, and therefore considered Transfers of such units, without complying with the terms of the Main Holding LLC Agreement;

(vii)   Defendant Hergert breached his fiduciary duties to Plaintiffs, as minority owners of Main Holding, by assisting Geramita's effort to acquire additional units in Main Holding in a manner contrary to the terms of the Main Holding LLC Agreement;

(viii)  Defendant Hergert breached his professional and fiduciary duties to Plaintiff DeMarino by negligently or willfully providing her with false assurances and erroneous advice with respect to her personal guarantee of $375,000; and

(ix)    Defendant Hergert negligently, recklessly and/or willfully encouraged Plaintiff DeMarino to make a $300,000 "bridge loan" to the Main Medical companies, by providing her with false assurances as to the safety and duration of the loan, by failing to

provide her with competent legal advice, and by failing to suggest that she seek independent counsel.

77.     In addition to breaching his duties to Plaintiffs, as Members of Main Holding and as his clients, Defendant Hergert further injured Plaintiff DeMarino by breaching his fiduciary duties, as a Member/Director of all of the Main Medical Companies, to her as a secured creditor of all three companies.

78.     In view of the inadequate equity raised by Main Holding to acquire MAIN and MMV and thereafter meet its obligations, the Main Medical companies were insolvent from the moment that Defendant Hergert completed the acquisitions by Main Holding.   Further, Defendant Hergert knew, or in the exercise of reasonable diligence should have known, of the imminent failure of the Main Medical companies due to their inadequate capitalization.

79.     Under both Delaware law (applicable to Defendant Hergert's duties respecting Main Holding) and Pennsylvania law (applicable to Defendant Hergert's duties respecting MAIN and MMV), when the Main Medical companies became insolvent, Defendant Hergert owed fiduciary duties to the companies' creditors—including Plaintiff DeMarino.

80.      Rather than manage and counsel the Main Medical companies to maximize repayment of creditors (while complying with the companies' legal obligations respecting patient medical records), Defendant Hergert acted to protect his own interests and those of Geramita in retaining control of the assets of the failed companies.

81.     For example, in advance of being compelled to do so by the Attorney General of Pennsylvania, Defendant Hergert and Geramita failed to make reasonable efforts, or to cooperate with Plaintiff DeMarino's efforts, to protect the medical records of the failed companies' patients.   Likewise, Defendant Hergert and Geramita improperly refused an offer by Plaintiff DeMarino to pay the $15,000 retainer fee of a liquidation specialist experienced in maximizing the value of distress/insolvent companies.  In addition, Defendant Hergert improperly and unethically attempted to coerce Plaintiff DeMarino to abandon her lien and rights arising from the $300,000 supposed "bridge loan" he improperly counseled her to make.

- 22 -

82. Specifically, Defendant Hergert refused to correct erroneous information provided to the Attorney General of Pennsylvania concerning the Managers and Directors of the Main Medical companies unless Plaintiff DeMarino agreed to release her liens against, and security interests in, Main Medical's equipment. Defendant Hergert's action is described in a letter dated June 7, 2004, from Paula Schmeck, Esq. to Defendant Hergert as follows:

> Re: Main Medical Holding, LLC (the "Holding Company"); Main Medical Ventures, LLC ("Ventures"); and, Mid-Atlantic Imaging, Inc., et al ("Mid Atlantic Imaging" and together with the Holding Company and Ventures, collectively, the "Main Medical Companies")
>
> Dear Jon:
>
> As you know, we requested that you, as a director and legal counsel to each of the Main Medical Companies provide a factual Affidavit for submission to the Attorney General's Office setting forth the identity of the officers, directors/managers, or medical directors of each of the Main Medical Companies and the time periods during which such positions were held. The purpose of the requested Affidavit was to correct certain of the averments set forth in the Attorney General's Complaint in Equity and Petition for Permanent Injunction dated May 27, 2005 and especially, the averments that Plaintiff DeMarino was an officer, director and medical director of certain or all of the Main Medical Companies at the time the facilities were closed on April 5, 2005 and as such, was responsible for the maintenance and distribution of patient medical records at that time.
>
> As you know, and as you have indicated in prior communications and correspondence to me and with the Attorney General's office, Plaintiff DeMarino was not an officer, director/ manager, or medical director of any of the Main Medical Companies at the time the facilities were closed on April 5, 2005. As you previously have acknowledged Plaintiff DeMarino resigned from any position she held with any of the Main Medical Companies effective March 12, 2005. She was not consulted or advised of the closing of the facilities.
>
> Last evening you indicated that you would provide the requested Affidavit only if Plaintiff DeMarino agreed to release her security interests and liens on certain of the Main Medical Companies' equipment to permit sale proceeds realized from such equipment to be used to fund outstanding payroll. I directly asked you if you were "holding the Affidavit hostage unless Plaintiff DeMarino agreed to fund outstanding payroll." You stated unequivocally yes. By way of this letter, please be advised that Plaintiff DeMarino hereby rejects your ransom demand.

> As you know, prior to March 12, 2005 and Plaintiff DeMarino's resignation, all of the Main Medical Companies were current on payroll and medical records were properly being stored, maintained and distributed to patients. At the time the Main Medical Companies defaulted in their payroll obligations, Plaintiff DeMarino was not an officer or director of any of the Main Medical Companies. Moreover, she was never in control of the management, finances or operation of any of the Main Medical Companies at any time during her affiliation with the companies, including, without limitation, the time the Main Medical Companies defaulted in their payroll obligations. That control rested with you and Mr. Geramita. Although she has no control or authority over any of the Main Medical Companies she has lent, and continues to lend, her assistance to find hospitals and other entities to take custody of the patient medical records.
>
> Your refusal to correct the public record in this matter is unconscionable and presumably, is taken for no purpose other than to cause harm to Plaintiff DeMarino both personally and professionally.

83.     In addition to his improper efforts to coerce Plaintiff DeMarino to release her legal rights and bear the burden of the improper, negligent, and/or reckless manner in which Defendant Hergert and Geramita closed the facilities of the Main Medical companies, Defendant Hergert further violated his fiduciary and professional duties by negligently or willfully failing to advise Plaintiff DeMarino of Directors and Officers ("D&O") insurance coverage purchased by the Main Medical companies on her behalf or, in the alternative, to provide timely notice of covered claims to the companies' D&O insurer, when the Pennsylvania Attorney General, based on erroneous information that Defendant Hergert refused to correct, included Plaintiff DeMarino as a defendant in a lawsuit filed to require the Main Medical companies to distribute and protect patient medical records.

84.     Because of his failure to advise her of such coverage or to provide timely notice to the companies' D&O insurer, Plaintiff DeMarino was forced to incur nearly $100,000 in unreimbursed legal fees.

**Count I**
**Violation of Rule 10b-5 promulgated under United States Securities Act of 1934**
**(in Connection With the Offer and Sale of Securities)**
*(Plaintiff Bray v. Defendants)*

85.     Plaintiff Bray hereby incorporates the allegations of paragraphs 1 through 84 by reference, as if fully set out herein.

86.     Plaintiff Bray's 167 Class B units in Main Holding are securities as defined in the Securities Act of 1934 (hereinafter, the "'34 Act"), 15 U.S.C. § 78(c).

87.     Defendant Hergert offered to sell securities to Plaintiff Bray by delivering to her the July 7 Circular, and by drafting and delivering to her a subscription agreement for Class B units, and by discussing her proposed investment in Main Holding with her.

88.     In the absence of Defendant Hergert's untrue statements, misleading omissions, device, scheme, and/or artifice, Plaintiff Bray would not have agreed to invest $50,100 to purchase 167 Class B units of Main Holding.

89.     Defendant Hergert knew that the July 7 Circular, the Subscription Agreement, and his communication with Plaintiff Bray about her investment of $50,100 solicited the purchase of securities by means of untrue statements of a material fact and/or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

90.     Defendant Hergert's untrue statements and/or misleading omissions in connection with Plaintiff Bray's 167 Class B units have caused Plaintiff Bray to suffer damages of at least $50,100, plus interest.

**Count II**
**Violation of Rule 10b-9 promulgated under United States Securities Act of 1934**
**(in Connection With the Offer and Sale of Securities)**
*(Plaintiff Bray v. Defendants)*

91.     Plaintiff Bray hereby incorporates the allegations of paragraphs 1 through 90 by reference, as if fully set out herein.

92.     Plaintiff Bray's 167 Class B units in Main Holding are securities as defined in the '34 Act, 15 U.S.C. § 78c(a)(10)

93.     Defendant Hergert offered to sell securities to Plaintiff Bray by delivering to her the July 7 Circular that included a manipulative or deception device or contrivance, by stating that the full consideration paid for any such security would be refunded if all or some of the securities were not sold.

94.     Specifically, in and through the July 7 Circular, Defendant Hergert made the following representation:

> The Closing Date, as determined by the Company, may occur at any time after the Company has, on or prior to the Termination Date, accepted subscriptions for 5,000 Class B Units and 1334 Class C Units (or the Minimum Closing Conditions have been satisfied).  Except as provided in the immediately following sentence, in the Event that on or prior to the Termination Date the Company has not received an [sic] accepted subscriptions for 5000 Class B Units and 1,334 Class C Units or if the Share Acquisition Closing does not occur, (a) funds previously received from prospective Investors that have tendered subscriptions for Class B Units will be returned without interest…

95.     Contrary to the representation of the July 7 Circular, Plaintiff Bray's Class B shares were **not** part of an offering or distribution being made on the condition that all or a specific part of the consideration paid for such security would be promptly refunded, if its Minimum Closing Conditions were not met.

96.     In the absence of Defendant Hergert's untrue statements, misleading omissions, device, scheme, and/or artifice, Plaintiff Bray would not have agreed to invest $50,100 to purchase 167 Class B units of Main Holding.

97.     As set forth above, Defendant Hergert knew that the July 7 Circular included a manipulative device or contrivance respecting the refunding of consideration if the Minimum Closing Conditions were not met.

98.     Defendant Hergert  knew that the Minimum Closing Conditions were not met, but he nonetheless proceeded with the closing and did not advise Main Holding to refund the consideration for Plaintiff Bray's Class B shares.

99.     Defendant Hergert's use of a manipulative and deception device in connection with the sale of Plaintiff Bray's 167 Class B units caused Plaintiff Bray to suffer damages of at least $50,100, plus interest.

## Count III
## Violation of 70 P.S. §§ 1-401, 1-501 and 1-503 (Fraudulent and Prohibited Practices in Connection With the Offer and Sale of Securities)
### (Plaintiff Bray v. Defendants)

100.     Plaintiff Bray hereby incorporates the allegations of paragraphs 1 through 99 by reference, as if fully set out herein.

101.     Plaintiff Bray purchased 167 Class B units in Main Holding on August 13, 2004 in reliance on the July 7 Circular.

102.     Plaintiff Bray's units are securities as defined in 70 P.S. § 1-102.

103.     Defendant Hergert offered to sell securities to Plaintiff Bray by delivering to her the July 7 Circular, and also by drafting and delivering to her a subscription agreement for Class B shares, and by discussing with her by telephonic means her proposed investment in Main Holding.

104.     In the absence of Defendant Hergert's untrue statements, misleading omissions, device, scheme, and/or artifice, Plaintiff Bray would not have agreed to invest $50,100 to purchase 167 Class B units of Main Holding.

105.     As set forth above, Defendant Hergert knew, or in the exercise of reasonable care should have known, that the July 7 Circular, the subscription agreement, and his

communication with Plaintiff Bray about her investment of $50,100, solicited the purchase of securities by means of untrue statement of a material fact and/or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, and also included a device, scheme or artifice to defraud as set forth above.

106.    Defendants' untrue statements and/or misleading omissions in connection with the Plaintiff Bray's 167 Class B units have caused Plaintiff Bray to suffer damages of at least $50,100, plus interest.

## Count IV
## Negligent Misrepresentation in Connection With the Offer and Sale of Securities
### *(Plaintiff Bray v. Defendants)*

107.    Plaintiff Bray hereby incorporates the allegations of paragraphs 1 through 106 by reference, as if fully set out herein.

108.    As set forth above, Defendant Hergert, under circumstances in which he ought to have known the falsity thereof, both directly and by innuendo, made material false representations and/or material omissions to Plaintiff Bray to induce her to invest $50,100 for the purchase of 167 Class B units in Main Holding.

109.    Plaintiff Bray detrimentally and justifiably relied upon Defendants' false representations and/or omission and failures to disclose material information.  In their absence, Plaintiff Bray would not have invested in Main Holding.

110.    Defendants' material omissions and misrepresentations caused Plaintiff Bray to suffer damages of at least the principal $50,100, plus interest.

**Count V**

**Violation of Rule 10b-5 promulgated under United States Securities Act of 1934
(in Connection With the Offer and Sale of Securities)**

*(Plaintiff DeMarino v. Defendants)*

111.     Plaintiff DeMarino hereby incorporates the allegations of paragraphs 1 through 110 by reference, as if fully set out herein.

112.     Plaintiff DeMarino's 1500 Class A units in Main Holding, the May 5 Note, and the October 22 Note are all securities as defined in 15 U.S.C. 78c(a)(10).

113.     Defendant Hergert offered to sell, and sold, the 1500 Class A Securities of Main Holding to Plaintiff DeMarino by drafting and delivering to her the July 7 Circular and Main Holding LLC Agreement.  Defendant Hergert offered to sell, and sold, securities to Plaintiff DeMarino, on behalf of Main Holding by drafting and delivering the May 5 Note for the purpose of inducing Plaintiff DeMarino to finance 1500 Class A units for Geramita.

114.     Defendant Hergert offered to sell, and sold, securities to Plaintiff DeMarino, on behalf of Main Holding by drafting and delivering to her the October 22 Note, and by advising her as to the safety and security of the $300,000 loan evidenced therein.

115.     In the absence of Defendant Hergert's untrue statements, misleading omissions, device, scheme, and/or artifice, Plaintiff DeMarino would not have agreed to invest any or all of the $600,000 that she invested in Main Holding.

116.     As set forth above, Defendant Hergert knew that the May 5 Note, Main Holding LLC Agreement, July 7 Circular and October 22 Note solicited the purchase of securities by means of untrue statement of a material fact and/or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, and also included a device, scheme or artifice to defraud as set forth above.

117.     Defendants' untrue statements and/or misleading omissions in connection with the Plaintiff DeMarino's investments in Main Holding caused Plaintiff DeMarino to suffer damages of at least $600,000, plus interest.

**Count VI**
**Violation of 70 P.S. §§ 1-401, 1-501 and 1-503 (Fraudulent and**
**Prohibited Practices) in Connection With the Offer and Sale of Securities)**
*(Plaintiff DeMarino v. Defendants)*

118.    Plaintiff DeMarino hereby incorporates the allegations of paragraphs 1 through 117 by reference, as if fully set out herein.

119.    Plaintiff DeMarino's 1500 Class A units in Main Holding, the May 5 Note, and the October 22 Note are all securities as defined in the 70 P.S. § 1-102.

120.    Defendant Hergert offered to sell, and sold, the 1500 Class A Securities of Main Holding to Plaintiff DeMarino by drafting and delivering to her the July 7 Circular and Main Holding LLC Agreement.  Defendant Hergert offered to sell, and sold, securities to Plaintiff DeMarino on behalf of Main Holding by drafting and delivering the May 5 Note for the purpose of inducing Plaintiff DeMarino to finance 1500 Class A units for Geramita.

121.    Defendant Hergert offered to sell, and sold, securities to Plaintiff DeMarino, on behalf of Main Holding by drafting and delivering to her the October 22 Note, and by advising her as to the safety and security of the $300,000 loan evidenced therein.

122.    In the absence of Defendant Hergert's untrue statements, misleading omissions, device, scheme, and/or artifice, Plaintiff DeMarino would not have agreed to invest any or all of the $600,000 that she invested in Main Holding.

123.    As set forth above, Defendant Hergert knew, or with the exercise of reasonable diligence should have know, that the May 5 Note, the July 7 Circular, the Main Holding LLC Agreement, and his communications with her about her investments solicited the purchase of securities by means of untrue statement of a material fact and/or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, and also included a device, scheme or artifice to defraud as set forth above.

124.    Defendant Hergert's untrue statements and/or misleading omissions in connection with her investments in Main Holding have caused Plaintiff DeMarino to suffer damages of at least $600,000, plus interest.

## Count VII
## Negligent Misrepresentation in Connection With the Offer and Sale of Securities
### (Plaintiff DeMarino v. Defendants)

125.    Plaintiff DeMarino hereby incorporates the allegations of paragraphs 1 through 124 by reference, as if fully set out herein.

126.    As set forth above, Defendant Hergert, under circumstances in which he ought to have known the falsity thereof, both directly and by innuendo, made material false representations and/or material omissions to Plaintiff DeMarino to induce her to lend $150,000 on an unsecured basis to Geramita, to invest $150,000 to purchase Class A units in Main Holding, and to make a supposed short-term "bridge loan" to the Main Medical companies in the amount of $300,000.

127.    Plaintiff DeMarino detrimentally and justifiably relied upon Defendants' false representations and/or omission and failures to disclose material information.  In their absence, Plaintiff DeMarino would not have agreed to lend any money to Geramita or make any investments in Main Holding.

128.    Defendants' material omissions and representations that, on information and belief, were false have caused Plaintiff DeMarino to suffer damages of at least the principal $600,000, plus interest.

## Count VIII
## Unlawful Concerted Action
### (Plaintiffs v. Defendants)

129.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 128 by reference, as if fully set out herein.

130.    As set forth above, in connect with the offer and sale of securities, Defendant Hergert committed material misrepresentations, material omissions and/or failures to disclose material facts in concert with Geramita or pursuant to their common design to complete Main Holding's acquisitions regardless of the implications for, and harm to, investors in Main Holding.

131.    In the alternative, Defendant Hergert knew that Geramita's conduct was a breach of duties to investors and potential investors in Main Holding and he gave substantial assistance or encouragement to Geramita to so conduct himself;

132.    In the alternative, Defendant Hergert gave substantial assistance to Geramita in committing fraud and/or material misrepresentations and/or failures to disclose material facts, and Defendant Hergert's own conduct, separately considered, constituted a breach of duty as a seller of securities, Manager and counsel to Main Holding, and counsel to Plaintiff DeMarino.

133.    Defendant Hergert's actions in concert with Geramita have caused Plaintiff Bray to suffer damages in excess of $50,100 and Plaintiff DeMarino to suffer damages in excess of $600,000 plus interest.

### Count IX:
### Breach of Fiduciary Duties
*(Plaintiff Bray v. Defendants)*

134.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 133 by reference, as if fully set out herein.

135.    As a Manager of Main Holding—a Delaware Limited Liability Company—Defendant Hergert had fiduciary duties to the company and its Members of good faith, loyalty, and due care under Delaware law.

136.    As a Director of MAIN and MMV, Defendant Hergert had fiduciary duties to those companies and their owners under Pennsylvania law.

137.    Defendant Hergert's failure, *inter alia*, to disclose material information about the Main Medical companies, the failure of Main Holding's financing efforts, and his conflicts of interests, breached his fiduciary duties to Plaintiff Bray.

138.    Defendant Hergert's decision and action to complete acquisitions by Main Holding of MAIN and MMV, despite Main Holding's undercapitalization and the inability of the Main Medical companies to meet their obligations when due, breached his fiduciary duties to Plaintiff Bray

139.    Defendant Hergert's breach of fiduciary to Plaintiff Bray caused her to suffer damages of at least the principal $50,100, plus interest.

### Count X
### Breach of Fiduciary Duties
#### *(Plaintiff DeMarino v. Defendants)*

140.    Plaintiffs hereby incorporate the allegations of paragraphs 1 through 139 by reference, as if fully set out herein.

141.    As a Manager of Main Holding–a Delaware Limited Liability Company–Defendant had fiduciary duties to the company and its Members of good faith, loyalty, and due care under Delaware law.

142.    As a Director of MAIN and MMV, Defendant Hergert had fiduciary duties to those companies and their owners under Pennsylvania law.

143.    Defendant Hergert's failures, *inter alia*, to disclose material information about, and explain, the May 5 Note to disclose the failure of Main Holding's financing efforts, to disclose his conflicts of interests, to advise Plaintiff DeMarino of the terms of his engagement, and to provide true and complete legal advice regarding documents he requested her to execute, violated his fiduciary duties to Plaintiff DeMarino.

144.    Upon the insolvency of the Main Medical companies, Defendant Hergert also had fiduciary duties to the creditors of the company, including Plaintiff DeMarino.

145.     Defendant Hergert further violated his fiduciary duties to Plaintiff
DeMarino, including his duty of good faith, by affirmatively acting contrary to her interests as a
creditor of the Main Medical companies, by attempting to coerce her to waive her lawful rights,
and by improperly attempting to coerce her to bear responsibility for the failures of the Main
Medical companies to comply with their obligations respecting patient medical records when
they closed their facilities, even though he knew, or should have know, that Plaintiff DeMarino
had no role, no advance knowledge, no duties, and no authority to act, in connection with such
closings and patient records.

146.     Defendant Hergert's breach of fiduciary duties to Plaintiff DeMarino not
only impaired Plaintiff DeMarino's rights as a creditor, but also caused her to incur unnecessary
legal expenses and injured her professional reputation and medical practice.

147.     Damages arising from Defendant Hergert's breaches of fiduciary and
professional duties to Plaintiff DeMarino caused her to suffer damages in excess of $700,000 and
additional amounts to be proven at trial.

### Count XI
### Breach of Professional Duties-Malpractice
#### *(Plaintiff DeMarino v. Defendants)*

148.     Plaintiffs hereby incorporate the allegations of paragraphs 1 through 147
by reference, as if fully set out herein.

149.     As counsel to Plaintiff DeMarino, Defendant Hergert's breached his
professional duties to her by failing to disclose and explain (i) material information about the
May 5 Note, (ii) failure of Main Holding's financing efforts, and (iii) his conflicts of interests.

150.     As counsel to Plaintiff DeMarino, Defendant Hergert also breached his
professional duties to her by failing, *inter alia*, to disclose the terms of his engagement and by
failing to provide accurate and complete legal advice regarding documents he requested her to
execute.

151.     As counsel to Plaintiff DeMarino, Defendant Hergert further violated his
professional duties to her by affirmatively acting contrary to her interests as a former client, by

attempting to coerce her to waive her lawful rights, and by improperly attempting to coerce her to bear responsibility for the failures of the Main Medical companies to comply with their obligations respecting patient medical records when they closed their facilities, even though he knew, or should have know, that Plaintiff DeMarino had no role, no advance knowledge, no duties, and no authority to act, in connection with such closings and patient records.

152. Defendant Hergert's breach of professional duties to Plaintiff DeMarino not only caused injury to Plaintiff DeMarino related to her investments in the Main Medical companies, but also caused her to incur unnecessary legal expenses and injured her professional reputation and medical practice.

153. Defendant Hergert's breach of professional duties to Plaintiff DeMarino caused her to suffer damages in excess of $750,000 and additional amounts to be proven at trial.

### Respondeat Superior/Vicarious Liability
### 15 Pa. Code § 2925(c)

154. Plaintiffs hereby incorporate the allegations of paragraphs 1 through 153 by reference, as if fully set out herein.

155. Defendant Hergert's negligent and improper acts set forth herein were performed within the scope of his employment at Eckert Seamans, while performing professional services, with the knowledge of Eckert Seamans, and for the benefit of Eckert Seamans.

156. Defendant Hergert advised Eckert Seamans and obtained permission to serve as a Manager of Main Holding while also providing legal services related to Main Holding.

157. Defendant Hergert prepared all the offering materials that he sent to Plaintiffs as a Partner/employee of Eckert Seamans and supervised other employees and staff of Eckert Seamans who assisted him in the preparation of offering materials and other documents related to the Main Holding companies.

158. Defendant Hergert provided legal advice to Plaintiff DeMarino within the scope of his duties as an attorney of Eckert Seamans.

159.    Eckert Seamans authorized Defendant Hergert to prepare in the name of Eckert Seamans certain opinion letters related to the transactions here at issue.

160.    Eckert Seamans directly benefited from Defendant Hergert's actions as a Director/Manager of the Main Holding companies, because Defendant Hergert's compensation for such services was provided in the form of legal fees in excess of $100,000 paid to his law firm.

161.    Defendant Eckert Seamans is responsible and liable to Plaintiffs for the negligent and unlawful acts of Defendant Hergert giving rise to this action as set forth herein, thus making it a proper defendant and liable for the causes of action set forth in Counts I and VII above.

## Prayer For Relief

WHEREFORE, Plaintiffs respectfully pray that they be awarded:

A.    Actual damages to be proved at trial;

C.    Punitive Damages;

D.    All costs and expenses, including without limitation reasonable attorneys' fees and expenses;

E.    Such other and further relief that the Court deems just and proper.

JURY TRIAL DEMANDED.

Dated: October 6, 2006

 s/Gary L. Kaplan
Gary L. Kaplan, Pa. I.D. 75524
David J. Berardinelli, Pa. I.D. No. 79204
DeForest Koscelnik Yokitis & Kaplan
Koppers Building, 30th Floor
436 Seventh Avenue
Pittsburgh, PA  15219-1831
(412) 227-3100

Counsel for Plaintiffs DeMarino and Bray.